UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| THE ESTATE OF DAVID SHAFER, and COLLEEN SHAFER, an individual,<br><br>                              Plaintiffs,<br><br>    v.<br><br>THE CITY OF SPOKANE, a municipal corporation,<br><br>                              Defendant. | NO. 2:22-CV-0220-TOR<br><br>ORDER GRANTING MOTION FOR SUMMARY JUDGMENT |

BEFORE THE COURT is Defendant's motion for summary judgment (ECF No. 30). This matter was submitted for consideration without oral argument. The Court has reviewed the record and files herein and is fully informed. For the reasons given below, Defendant's motion for summary judgment is **GRANTED**.

**BACKGROUND**

This motion for summary judgment arises out of the fatal police shooting of David Shafer. ECF No. 17 at 8, ¶ 4.28. Because these issues present themselves in

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT ~ 1

the posture of a motion for summary judgment, the Court will view all facts and draw all reasonable inferences therefrom in the light most favorable to Plaintiffs as the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The record also contains video footage taken from the shooting officer's Axon body camera. ECF No. 32-2. Where the video evidence affirmatively contradicts Plaintiffs' version of the facts, the Court will not credit Plaintiffs' assertions. *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) (citing *Scott*, 550 U.S. at 378-79). However, the existence of video footage itself will not "foreclose a genuine factual dispute as to the reasonable inferences that can be drawn from that footage." *Id.* (citing *Scott*, 550 U.S. at 380).

## FACTS

Mr. Shafer and his wife, Plaintiff Colleen Shafer, lived and raised their five children here in Spokane, Washington. *Id.* at 4, ¶ 4.3. Mr. Shafer and his wife were religious people, and in addition to attending regular church services, Mr. Shafer also frequently met with a men's small group led by church elder David Palmer. *Id.* at ¶ 4.5; *see also* ECF No. 36-2 at 4, 2:00.

As a child, Mr. Shafer was the victim of physical and sexual abuse. ECF No. 17 at 4, ¶ 4.1. In adulthood, he struggled with depressive disorder, suicidal ideation, and alcoholism. *Id.* at ¶ 4.2; ECF No. 38 at 2, ¶¶ 5-7. Mr. Shafer was

also physically disabled due to a back injury from his years of hard labor as a welder.  ECF No. 17 at 4, ¶ 4.4.

Mr. Shafer's family and church community knew of his mood and substance abuse disorders.  ECF No. 36-2 at 4-5, ¶ 2:15.  When Mr. Shafer first disclosed to Mr. Palmer and his pastor, Bill Putnam, that he was experiencing suicidal ideation, Mr. Palmer took what he believed to be all of Mr. Shafer's weapons and stored them in his own home garage.  *Id.*  Mr. Shafer was also set to begin inpatient alcohol treatment at the end of October 2019.  *Id.* at 5, ¶ 4.6.

On October 23, 2019, while his wife and children were out of the home at work and school, Mr. Shafer began binge drinking.  *Id.* at ¶ 4.8.  As he grew increasingly intoxicated, Mr. Shafer also began to experience suicidal ideation.  *Id.* at ¶ 4.10.  In the early afternoon, he called Mr. Palmer for assistance, saying he "wanted to go be with God" and "that he had a . . . 9-millimeter . . . he'd been putting [to] his head."  ECF No. 36-2 at 6, 4:38.  Accompanied by Pastor Putnam, Mr. Palmer loaded up his truck and began the drive to Mr. Shafer's neighborhood.  *Id.*  Mr. Palmer kept Mr. Shafer on the phone for most of the ride, while Pastor Putnam placed a separate call to 911.  *Id.*  Pastor Putnam reported that Mr. Shafer was suicidal, had a firearm, and was intoxicated.  ECF No. 31-2 at 2.

On the way to Mr. Shafer's home, Mr. Palmer took a fortuitous wrong turn and encountered Mr. Shafer—who had decided he no longer wanted assistance—

walking along the street.  ECF No. 36-2 at 6, 4:38.  According to Mr. Palmer,

> [H]e reached behind his back and pulled out the 9 millimeter, and he didn't point it at us, but he was kind of waving it around and stumbling because he was very drunk.  He got in the car with the weapon, . . . got in the backseat and was thrashing around quite a little bit.  Yelling quite a lot, it was a violent situation, Bill . . . had grabbed his right arm and pulled it forward so that he was sort of pinned down just a little bit.  I was in the driver's seat trying to get the gun away from him, and I was, you know, speaking loudly to him, give me the gun, right, give me the gun, and [ ] he said no, I'm, not going to give you the gun, [and] I said you're going to give me the gun, and I reached back there and, and he, he actually let it go.

*Id.* at 6-7, 4:38

Mr. Palmer then stored the gun in the glove compartment.  *Id.*  Meanwhile, Mr. Shafer jumped out of the car and began walking back up towards his home. *Id.*  Mr. Palmer observed that he was stumbling and weaving around.  *Id.*  Mr. Shafer expressed that he had another .22 millimeter gun in his home and was "gonna get that and finish this off."  *Id.*  Mr. Palmer and Pastor Putnam continued to slowly follow him back up the street in their truck before stopping about 50 yards outside his home.  *Id.*

At that point, Spokane police officer Caleb Martin had arrived on scene after receiving a call from dispatch.  ECF No. 32-1 at 2, ¶ 3.  Officer Martin averred that he knew Mr. Shafer to be suicidal and intoxicated, and knew that he had past suicide attempts.  *Id.*  Officer Martin was concerned because Mr. Shafer's home was in a residential area within one block of an elementary school, which was in

1  session at the time.  *Id.* at ¶¶ 4, 6.  Believing the threat to be serious "enough to

2  warrant a three officer response," he called for backup.  *Id.* at ¶ 2.

3         The body camera footage shows that it was a sunny day, visibility was clear,

4  and background noise was minimal.  *See generally* ECF 32-2.  Officer Martin

5  arrived on scene at approximately 1:40 p.m. and parked his patrol vehicle at the

6  end of the street.  *See* 32-1 at 3, ¶ 10; *see also generally* ECF 32-2.  He took his

7  long rifle out of the car with him.  ECF Nos. 32-1 at 3, ¶ 11; 32-2 at 5:07.

8         As he was walking up the street, Officer Martin encountered Mr. Palmer and

9  Pastor Putnam, who were still in their truck.  ECF No. 32-2 at 5:12.  They relayed

10  that Mr. Shafer was "at his house" and "completely out of it."  *Id.* at 5:14.  Mr.

11  Palmer added, "I wouldn't go in alone if I were you."  *Id.* at 5:25-5:27.  They gave

12  the gun they had wrested from Mr. Shafer to Officer Martin, but added that they

13  believed he had other guns in the home.  *Id.* at 5:28-5:32.  Officer Martin secured

14  the gun in his patrol vehicle.  *Id.* at 6:12.

15        After storing the gun, Officer Martin stood near Mr. Palmer's truck.  *Id.* at

16  8:00.  The window was down and Mr. Palmer had Mr. Shafer on speaker phone, so

17  the conversation between them could be heard by Officer Martin.  *Id.*; *see also*

18  ECF No. 36-2 at 8, 9:50.  Mr. Palmer asked Mr. Shafer, "Where are you right now,

19  are you at the house?"  ECF No. 32-2 at 8:00-8:02.  Mr. Shafer replied, "I'm sitting

20  on the front step waiting for the cops with the .22 semiautomatic [pistol] that my

father gave me." *Id.* at 8:02-8:10.  Officer Martin relayed this statement to

dispatch as he stepped away from the truck, adding that he could see Mr. Shafer

sitting on his front steps. *Id.* at 8:12-8:20.  As Officer Martin was speaking to

dispatch, Officer Daniel Cole arrived and parked in front of Officer Martin's

vehicle. *Id.* at 8:16.

Mr. Palmer kept Mr. Shafer on the phone, who was distressed that Mr.

Palmer and Pastor Putnam were no longer nearby where he could see them from

his driveway.  ECF No. 36-2 at 8, 9:50.  Mr. Palmer responded,

> [N]o, we didn't leave you.  We're right here.  We got eyes on you.  And
> [Mr. Shafer] said, well, then if you got eyes on me, what am I doing
> right now?  And I said, well, I can't actually see you . . . but I can see
> your truck,[1] and so at that point, he walked out and got . . . near the bed
> of the truck.

*Id.*

Because he had walked away while speaking to dispatch and was lingering

next to his patrol vehicle, Officer Martin's body camera did not capture Mr. Shafer

discuss his position on the driveway with Mr. Palmer.  *See generally* ECF No. 32-2

at 8:12-9:27.  The Court infers that, based on his position and worn video footage,

Officer Martin did not overhear this exchange.  *Scott*, 550 U.S. at 378.

---

[1] Mr. Shafer's truck was parked in his driveway.  ECF No. 36-2 at 9, 10:29.

1    For approximately one minute, Officer Martin stood near his patrol vehicle

2  after phoning dispatch.  ECF No. 32-2 at 8:12-9:27.  During this time, he did not

3  speak to or otherwise communicate with Officer Cole, who remained in his car.  *Id.*

4    After about a minute of standing near his patrol car, Officer Martin began

5  walking towards Mr. Shafer's home with his rifle drawn.  *Id.* at 9:27-9:40.  Officer

6  Martin positioned himself behind a small sedan two driveways to the east of where

7  Mr. Shafer was standing.  *Id.* at 9:44-9:47.

8    The video footage shows that Mr. Shafer stood at the bed of his truck, facing

9  the west with his right arm raised, holding the .22 caliber pistol.  *Id.* at 9:46-9:49.

10  Directly across from Mr. Shafer's position in the driveway were a row of homes,

11  although it does not appear that any of those neighbors were outside at the time.

12  *Id.*  Mr. Shafer did not appear to notice yet that Officer Martin was standing to his

13  side.  *Id.*

14    Officer Martin did not identify himself, but yelled, "DROP THE GUN!

15  HEY!  DAVID!  DROP IT!"  *Id.* at 9:47-9:49.  Hearing the command, Mr. Shafer

16  turned around and faced Officer Martin, lowering the arm holding the gun to his

17  side.  *Id.* at 9:50.  Officer Martin loudly commanded, "DROP IT RIGHT NOW!"

18  *Id.* at 9:52.  The next second, however, Mr. Shafer raised the gun in Officer

19  Martin's direction.  *Id.* at 9:53.  Almost instantaneously, Officer Martin fired his

20

first shot at Mr. Shafer, who collapsed. *Id.* at 9:54.  Officer Martin then fired a second shot. *Id.* at 9:55-56.

Officer Cole, who had positioned himself several paces behind Officer Martin during this encounter, approached him, along with a third officer, Charles Pavlischak, who had arrived sometime in the interim. *Id.* at 10:40-11:11; ECF 37-1 at 13 (141)  Officer Martin returned to his patrol car, secured the rifle, and retrieved a medical aid kit.  ECF 32-2 at 11:50-12:00.  The Fire Department responded shortly thereafter to administer first aid. *Id.* at 14:41.

Mr. Shafer died from his injuries.  The .22 pistol which he had been brandishing was later found to be unloaded.  ECF No. 36 at 2.

**DISCUSSION**

The Court understands that this case presents competing interests which extend beyond the individual claims implicated in this action and which color the backgrounds of the parties' respective briefs.  As has been expressed time and again, the sometimes hazardous nature of police work forces law enforcement to make tactical judgments that can have fatal or other less-lethal but nevertheless severe consequences.  At the same time, it is axiomatic that officers have an obligation to avoid the deployment of deadly force when alternative means could be reasonably relied upon to deescalate a situation.  The narrow task before the

Court is not, however, to resolve these complex matters of public policy, but to answer the following questions:

1. Whether Defendant violated the Americans with Disabilities Act (ADA);

2. Whether Defendant violated the Rehabilitation Act; and

3. Whether Defendant acted negligently in violation of Washington State law.

*See* ECF No. 17 at 10-15.

In this case, the Court finds that Plaintiffs have not stated a claim under the ADA, because Mr. Shafer was not disabled under Title II and posed a direct threat to the public and the responding officers such that he could not be reasonably accommodated. For the same reasons, the Rehabilitation Act claim—which requires a virtually identical analysis—is also unsuccessful. The Court takes no position as to Plaintiffs' state law negligence claim, which it dismisses without prejudice.

**A.    Summary Judgment Standard**

The Court begins with a review of the summary judgment principles that govern its analysis of this case. The Court may grant summary judgment in favor of a moving party who demonstrates "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED.

1  R. CIV. P. 56(a).  In ruling on a motion for summary judgment, the Court must only

2  consider admissible evidence.  *Orr v. Bank of America, NT & SA*, 285 F.3d 764,

3  773 (9th Cir. 2002).  The party moving for summary judgment bears the initial

4  burden of showing the absence of any genuine issues of material fact.  *Celotex*

5  *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-

6  moving party to identify specific facts showing there is a genuine issue of material

7  fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  "The mere

8  existence of a scintilla of evidence in support of the plaintiff's position will be

9  insufficient; there must be evidence on which the jury could reasonably find for the

10  plaintiff."  *Id.* at 252.

11        For purposes of summary judgment, a fact is "material" if it might affect the

12  outcome of the suit under the governing law.  *Id.* at 248.  Further, a dispute is

13  "genuine" only where the evidence is such that a reasonable jury could find in

14  favor of the non-moving party.  *Id.*  The Court views the facts, and all rational

15  inferences therefrom, in the light most favorable to the non-moving party.  *Scott*,

16  550 U.S. at 378.  Summary judgment will thus be granted "against a party who

17  fails to make a showing sufficient to establish the existence of an element essential

18  to that party's case, and on which that party will bear the burden of proof at trial."

19  *Celotex*, 477 U.S. at 322.

20  //

1    **B.    Americans with Disabilities Act Claim**

2    Under the ADA, courts adjudicate challenges to adverse employment

3    decisions, educational barriers, housing accommodations, and more.  Increasingly,

4    but less commonly, courts in the Ninth Circuit have also permitted plaintiffs to

5    bring suit under the ADA for the actions of law enforcement.  In *Sheehan v. City &*

6    *Cnty. of San Francisco*, the Ninth Circuit sanctioned plaintiffs with disabilities to

7    sue under Title II of the ADA for both "(1) wrongful arrest, where police wrongly

8    arrest someone with a disability because they misperceive the effects of that

9    disability as criminal activity; and (2) reasonable accommodation, where, although

10    police properly investigate and arrest a person with a disability for a crime

11    unrelated to that disability, they fail to reasonably accommodate the person's

12    disability in the course of investigation or arrest, causing the person to suffer

13    greater injury or indignity in that process than other arrestees."  743 F.3d 1211,

14    1232 (9th Cir. 2014), *rev'd in part, cert. dismissed in part sub nom*, *City & Cnty. of*

15    *San Francisco, Calif. v. Sheehan*, 575 U.S. 600 (2015).  To stake a successful Title

16    II claim, a plaintiff must establish that: (1) they are an individual with a disability;

17    (2) they are otherwise qualified to participate in or receive the benefit of a public

18    entity's services, programs or activities; (3) they are either excluded from

19    participation in or denied the benefits of the entity's services, programs, or

20    activities, or otherwise discriminated against by the entity; and (4) such exclusion,

1  denial of benefits, or discrimination was because of their disability.  *Id.*

2  "Discrimination includes a failure to reasonably accommodate a person's

3  disability."  *Id.* at 1231.  Plaintiffs bringing a reasonable accommodation claim

4  under the ADA must "produc[e] evidence of the existence of a reasonable

5  accommodation," which the entity may defeat by showing that "the modifications

6  would fundamentally alter the nature of the service, program, or activity."  *Id.* at

7  1233 (quotations and citations omitted).

8         In *Sheehan*, the plaintiff suffered from schizoaffective disorder and lived in

9  a group home with other persons coping with mental illnesses.  *Sheehan*, 743 F.3d

10  at 1217; *see also* 575 U.S. at 603.  The plaintiff's bedroom was located on the

11  second floor, and the only way in or out of her room was through her door to the

12  second-floor hallway.  743 F.3d at 1218.[2]

13        When the plaintiff threatened her social worker with a knife and refused to

14  submit to a welfare check, the social worker cleared the building of other residents

15  and sought police assistance in transporting her to a mental health facility under a

16  California regulation that allows mental health professionals to initiate a temporary

17  detention of "gravely disabled" individuals for psychiatric evaluation and

18

19        [2] There was a window in Plaintiff's room, but "it could not be used as a

20  means of egress without a ladder."  743 F.3d at 1218.

1    treatment. *Id.* at 1217.  To qualify as gravely disabled, a person must be unable to

2    for her "basic personal needs for food, clothing, or shelter" due to a mental

3    disorder. *Id.* at 1217-18.

4          Two officers contacted the plaintiff in her room, who stood up from her bed

5    and advanced towards them with a knife in her hand, warning them to get out and

6    threatening to kill them. *Id.* at 1219.  The officers retreated and decided to call for

7    backup, but instead of waiting for backup, decided to force reentry based on a

8    concern that plaintiff had an avenue of escape or access to other weapons which

9    they were unaware of. *Id.*  A physical altercation ensued, and plaintiff was shot

10   and injured. *Id.* at 1220.

11         Plaintiff filed suit against the city and county of San Francisco, the police

12   chief, and the individual police officers involved in her arrest, alleging, among

13   other claims, that defendants had violated the ADA. *Id.* at 1220.  On appeal, the

14   Ninth Circuit held that the plaintiff had properly raised a reasonable

15   accommodation claim under the ADA by alleging that officers forced their way

16   into her room without accounting for her mental illness or employing tactics that

17   may have deescalated the situation. *Id.* at 1232-33.  Reasoning that "the

18   reasonableness of an accommodation is ordinarily a question of fact," the court

19   declined to grant defendants judgment as a matter of law on the ADA claim. *Id.*

20

Although certiorari was granted to resolve a circuit split regarding whether mentally disabled claimants could bring a failure to accommodate claim against law enforcement under Title II of the ADA, the Supreme Court ultimately did not reach the question because petitioners abandoned the issue in their briefing. *See City & Cnty. of San Francisco*, 575 U.S. at 608. Instead, petitioners effectively conceded that a reasonable accommodation claim could be raised under the ADA, but argued that Title II does not apply when individuals "'pose a direct threat to the health or safety of others.'" *Id.* at 608-9 (quoting 28 C.F.R. § 35.139(a) (2014)). Because the direct threat issue had not been raised in the petition for certiorari, however, the Court declined to answer the question of whether a direct threat exception existed. *Id.* at 610. The Court also declined to reach whether the ADA applies to arrests in the first instance, citing a lack of adversarial briefing. *Id.* Therefore, as both parties concede, disabled claimants may continue to bring ADA reasonable accommodation claims based on law enforcement actions in the Ninth Circuit. *See* ECF Nos. 30 at 14; 35 at 10.

Defendant argues that Mr. Shafer cannot prevail under the ADA because he was not disabled, not discriminated against, and posed a direct threat to his community and Officer Martin. ECF No. 30 at 7-19. Plaintiffs respond that Mr. Shafer was disabled. ECF No. 35 at 10-11. While they do not disclaim that Mr. Shafer posed a direct threat to Officer Martin when he began to point his gun at

1  him, they argue instead that he was denied of accommodation in the events

2  preceding his aiming of the weapon, such as by Officer Martin failing to wait for

3  backup or communicate with Mr. Shafer over the phone. *Id.* at 15-17.

4        **1.    Mr. Shafer was not disabled under the ADA.**

5        The Court agrees with Defendants that Mr. Shafer was not disabled within

6  the meaning of the ADA.  Whether a person is disabled under the ADA is an

7  individualized inquiry. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999),

8  *overturned on other grounds due to legislative action*.  A person is disabled for

9  purposes of the ADA if they have "(A) a physical or mental impairment that

10  substantially limits one or more of the major life activities of such individual; (B) a

11  record of such an impairment; or (C) [are] regarded as having such an

12  impairment." 42 U.S.C. § 12102(1).  A mental impairment may include a stress or

13  depressive disorder. *Snead v. Metro. Prop & Cas. Ins. Co.*, 237 F.3d 1080, 1088

14  (9th Cir. 2001).  Additionally, a drug or alcohol addiction may also qualify as an

15  impairment. *Pacific Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142,

16  1157 (9th Cir. 2013).  However, a mental or physical impairment which is merely

17  transitory—meaning it has an actual or expected duration of six months or less—

18  does not qualify as a disabling impairment under the ADA.  42 U.S.C. §

19  12102(3)(B).  In construing whether an impairment qualifies as a disability under

20

1  the ADA, courts should broadly construe the law in favor of coverage.  *Id.* at

2  (4)(A).

3           "Major life activities" include, but are unlimited to, "caring for oneself,

4  performing manual tasks, seeing, hearing, eating, sleeping, walking, standing,

5  lifting, bending, speaking, breathing, learning, reading, concentrating, thinking,

6  communicating, and working." 42 U.S.C. § 12102(2)(A); *see also Fraser v.*

7  *Goodale*, 342 F.3d 1032, 1039-40 (the activity should not just be of comparative

8  importance, but instead of central importance; for example, while eating is a major

9  life activity, eating chocolate cake is not).  A person is substantially limited as to a

10 major life activity if they are either unable to perform the activity or "'significantly

11 restricted as to condition, manner, or duration under which [they] can perform [the]

12 . . . activity as compared to the condition, manner or duration under which the

13 average person in the general population can perform that same major life

14 activity.'"  *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 885 (9th Cir.

15 2004) (quoting 29 C.F.R. § 1630.2(j) (brackets omitted)).

16          A record of impairment may be established "if the individual has a history

17 of, or has been misclassified as having, a mental or physical impairment that

18 substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k)(1);

19 *see Coons*, 383 F.3d at 886 (plaintiff did not introduce a record of an impairment

20 substantially limiting any major life activity where the only evidence proffered was

a letter from his doctor stating that he suffered from various impairments without references to said activities).  Plaintiffs may also establish disability by "being regarded" as having such an impairment. 42 U.S.C. § 12102(2)(C).  To establish disability under the "regarded as" prong, a plaintiff must show that the entity mistakenly perceived him as having either "a physical impairment that substantially limits one or more major life activities, or . . . an actual, nonlimiting impairment substantially limits one or more major life activities." *Coons*, 383 F.3d at 886 (quoting *Sutton*, 527 U.S. at 489).

According to a declaration provided on Plaintiffs' behalf from Brendon Scholtz, a licensed psychologist and consultive examiner for the Social Security Division of Disability Determination Services, Mr. Shafer was suffering from a host of mental disorders, including depressive disorder, a stress or trauma disorder, and alcoholism.  *See* ECF No. 38 at 2, ¶¶ 5-7.  Mr. Scholtz stated that his conclusions were based on interviews with and investigations of Mr. Shafer's close friends and family.  *Id.* at 3, ¶ 10.  Dr. Scholtz also averred,

> [T]he mental impairments Mr. Shafer was suffering from were a substantial limitation in his daily activities.  They substantially limited [his] ability to engage in meaningful and appropriate social and interpersonal functioning.  This limitation is seen in Mr. Shafer's estrangement from his wife of over 20 years, his alcohol abuse, his reaching out for crisis services, his plans to enter substance abuse treatment, his re-experiencing and attempts to avoid triggering memories of abuse, his chronic depressive symptoms, his taking prescribed psychotropic medications, his expression of hopelessness,

1    his suicidal thoughts and ideations, his inability to be a functioning

2    parent, and his extreme emotional lability.

3    *Id.* at 3, ¶ 9.

4         As aforementioned, the Court will not consider inadmissible evidence in

5    ruling on a motion for summary judgment.  *Orr*, 285 F.3d at 773.  The Court finds

6    that Dr. Scholtz's declaration is inadmissible because it lacks any underlying

7    factual support.  *See* FED. R. EVID. 702(b), (c) (the expert's testimony must be

8    "based on sufficient facts or data" and "the product of reliable principles and

9    methods"); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997) ("Nothing

10   in either *Daubert* or the Federal Rules of Evidence requires a district court to admit

11   opinion evidence that is connected to existing data only by the *ipse dixit* of the

12   expert.").  Dr. Scholtz vaguely asserts that he based his conclusions on

13   "investigations and interviews with individuals who regularly interacted with Mr.

14   Shafer."  ECF No. 38 at 3, ¶ 10.  Although interviews may be "a typical source of

15   information" for psychologists proffering an expert opinion, as Dr. Scholtz claims,

16   Plaintiffs leave to the imagination virtually all information regarding these

17   apparent interviews and investigations, including who was interviewed, what

18   questions were asked and answers elicited, and what interview methods were used,

19   among other things.  Indeed, Dr. Scholtz himself admitted that he was waiting on

20   outstanding medical records to confirm his own conclusions, which suggests to the

1    Court that his conclusions were, at best, precursory. *Id.* at 2, ¶ 5. *See I.V. v.*

2    *Wenatchee Sch. Dist. No. 246*, 342 F. Supp. 3d 1083, 1092 (E.D. Wash. 2018)

3    (declining to admit an expert declaration which rested upon the party's own

4    assumptions and recitation of the facts). As such, the Court does not credit Dr.

5    Scholtz's declaration in its analysis of whether Plaintiff was disabled.

6         Some uncontested circumstantial evidence does tend bolster Plaintiffs'

7    claims of disability; for instance, when Mr. Palmer was interviewed he noted that

8    Mr. Shafer had a history of suicidal ideation and sought help from his church

9    community before. ECF No. 36-2 at 4-5, 2:15. Additionally, some other evidence,

10   such as the fact that Mr. Shafer was about to enter inpatient treatment and that

11   Pastor Putnam indicated to dispatch that he had a history of suicide attempts, also

12   buoys Plaintiffs' assertions. ECF No. 32-1 at 2, ¶ 3.

13        Nevertheless, the evidence presented is insufficient to raise a genuine issue

14   of material fact as to whether Plaintiff's disability was merely long-term, as

15   compared to merely transitory, and, more importantly, whether it substantially

16   limited Plaintiff in any major life activity. Respecting the transitory nature of the

17   disability, Plaintiff proffered no evidence regarding how long Mr. Shafer had been

18   battling his mental illnesses, except to assert that the root of his disorders stemmed

19   from childhood traumas. ECF No. 17 at 4-5. While the second amended

20   complaint implies that these struggles were possibly an ongoing issue for Mr.

1   Shafer throughout his adult life, the only direct evidence in the record on this point

2   came from Mr. Palmer, who indicated that his initial conversation with Mr. Shafer

3   regarding his suicidal ideation "goes back, I really don't remember, but months

4   ago." ECF No. 36-2 at 4-5, 2:15; *see also* 42 U.S.C. § 12102(3)(B).

5          More importantly, Plaintiffs did not establish a genuine issue of material fact

6   as to whether Mr. Shafer was substantially limited in any major life activity by

7   reason of his disorders. There is some circumstantial evidence that Mr. Shafer's

8   thinking and communication skills were impaired, including his ability to care for

9   himself. However, much of this evidence is attributable to the fact that Mr. Shafer

10  was inebriated during his confrontation with Officer Martin and possibly also due

11  to the fact that he was experiencing an urgent and extreme but impermanent mental

12  health crisis. *See* ECF No. 17 at 5, ¶¶ 4.7; 4.11 (referring to Mr. Shafer's condition

13  on October 23, 2019 as a "mental health crisis" and noting that it was a pattern for

14  him to relapse and experience suicidal ideation while intoxicated). The Court lacks

15  any evidence as to what Mr. Shafer's functioning was like on a day-to-day basis

16  when he was sober. In fact, the amended complaint indicates that Mr. Shafer's life

17  was "meaningful and productive" in spite of his struggles and that his family and

18  church community were a strong support system. *Id.* at 4, ¶ 4.2. Because a

19  plaintiff must show the existence of an impairment which substantially limited one

20  or more of his major life activities to establish a disability under the ADA, the

Court cannot credit Plaintiffs' claims of disability.  42 U.S.C. § 12102(2)(A); *see also, e.g.*, *Lookabill v. City of Vancouver*, No. 13-5461-RJB, 2015 WL 4623938 at *8 (W.D. Wash. Aug. 3, 2015) (unreported) (plaintiff failed to establish that decedent had PTSD when the only evidence of impairment was decedent's partner's report to the responding officers that he was disabled).[3]

To be clear, the Court does not doubt that Mr. Shafer was afflicted with mental impairments which informed his actions on October 23, 2019.  But Plaintiffs failed to establish a genuine issue of material fact as to whether any of those impairments (1) were long-term and (2) substantially limited any major life activities.  As such, the Court finds that Plaintiff was not disabled under the ADA.

### 2.    Mr. Shafer could not be reasonably accommodated.

Even if Plaintiffs could summon some concrete evidence proving Mr. Shafer was disabled under the ADA, permitting them leave to amend their claims would prove futile because they cannot establish that Mr. Shafer entitled to reasonable accommodations under the circumstances of this case.

As abovementioned, plaintiffs may bring claims under Title II of the ADA for reasonable accommodation where police "fail to reasonably accommodate the

---

[3] The pleadings also suggest that Mr. Shafer could no longer work due to a back injury, but that physical impairment appears unrelated to Plaintiffs' claims.

1   person's disability in the course of investigation or arrest causing the person to

2   suffer greater injury or indignity in that process than other arrestees." *Sheehan*,

3   743 F.3d at 1232.  "[T]he plaintiff bears the initial burden of producing evidence of

4   the existence of a reasonable accommodation," which the public entity may defeat

5   by showing that the suggested modifications "'would fundamentally alter the

6   nature of the service.'"  *Id.* (quoting 28 C.F.R. § 35.130(b)(7)).  Additionally,

7   current regulations also excuse law enforcement from making a reasonable

8   accommodation when the individual poses a "direct threat to the health or safety of

9   others." 28 C.F.R. § 35.139(a).  In determining whether a direct threat exists,

10  public entities must undertake "an individualized assessment, based on reasonable

11  judgment that relies on current medical knowledge or on the best available

12  objective evidence, to ascertain: the nature, duration, and severity of the risk; the

13  probability that the potential injury will actually occur; and whether reasonable

14  modifications of policies, practices, or procedures or the provision of auxiliary aids

15  or services will mitigate the risk." *Id.* at (b).

16       The video evidence establishes that Mr. Shafer posed a direct threat to his

17  neighbors and responding officers.  Mr. Shafer was inebriated and pointing a gun

18  at homes in a residential neighborhood near an elementary school and on a public

19  road.  *See* ECF No. 32-2 at 9:47-9:56.  When instructed to drop the firearm, he

20  refused to comply and instead turned it on Officer Martin.  *Id.*  Though we now

know the pistol to be unloaded, Mr. Shafer's close range to residential homes[4] and responding officers posed a direct threat that Defendant reasonably confronted through the use of lethal force. *Compare Vos*, 892 F.3d at 1037 (remanding for the district court to consider whether officers reasonably accommodated the decedent, who barricaded himself in a gas station store and then charged out of the store towards officers standing approximately 30 feet away while holding a pair of scissors) *with Lookabill*, 2015 WL 4623938 at \*9 (veteran decedent, who was armed, suicidal, and erratic, posed a direct threat to the officers and others).

Plaintiffs concede that Officer Martin's use of force was reasonable from the moment the gun was turned on him, but focus instead on Officer Martin's pre-confrontation conduct, arguing that he should have waited for the third officer to arrive on scene, verbally or otherwise communicated with Officer Cole about a strategy for approaching Mr. Shafer, and opened a line of communication with Mr. Shafer on the phone. ECF No. 35 at 14-18. Plaintiffs also insist that Officer Martin should have listened to the rest of Mr. Shafer's phone conversation with

---

[4] Plaintiff's expert insinuates that Officer Martin was a safe distance away because he stood behind a small car several driveways from where Mr. Shafer stood. ECF No. 37-1 at 13. But as the circumstances of Mr. Shafer's death indicate, distance becomes less significant where firearms are involved.

Mr. Palmer, which they believe would have made it apparent that Mr. Shafer was not looking to get into a confrontation with police, but instead walking down the driveway to see his friends. *Id.* at 5-8, 16. Finally, Plaintiffs fault Officer Martin for failing to identify himself. ECF No. 17 at 8, ¶ 4.26. Given the nature of the threat posed, the Court finds that these were not reasonable accommodations which could have been made to deescalate the situation.

Regarding Officer Martin's failure to continue to listen to Mr. Shafer and Mr. Palmer's phone conversation and failure to identify himself after approaching Mr. Shafer, the Court does not find that a reasonable jury could conclude Plaintiffs are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Irrespective of the fact that listening to the phone conversation further might have alerted Officer Martin as to Mr. Shafer's purpose in walking down the middle of his driveway, the video footage captures him pointing a gun down the street towards his neighbors' homes. *See* ECF 32-2 at 9:47. The reasonable inference is that Mr. Shafer was either looking to get into a confrontation with friends, neighbors, or law enforcement, regardless of his stated intentions.

For similar reasons, the exigent nature of the confrontation did not obligate Officer Martin to pause and introduce himself. Officer Martin was wearing his law enforcement uniform, cap, and tactical gear. *See* ECF No. 32-2 at 5:02 (capturing Officer Martin's reflection in his car window). Moreover, Mr. Shafer was well-

1    aware that law enforcement was on scene.  Indeed, he specifically said to Mr.

2    Palmer that he was "waiting for the cops."  ECF No. 32-2 at 8:02-8:10.

3           The Court likewise does not find that Officer Martin's failure to open a line

4    of communication, speak with Officer Cole, or wait for Officer Pavlischak violated

5    the ADA.  Ideally, Officer Martin would have had the opportunity to speak to Mr.

6    Shafer over the phone or to strategize with Officer Cole prior to the time Mr.

7    Shafer began brandishing the gun towards his neighbors' homes.  But from the

8    time that Officer Martin relayed to dispatch that Mr. Shafer was waiting for the

9    police with his pistol, ECF No. 32-2 at 8:13-8:16, to the time that he saw Mr.

10   Shafer in the driveway and began approaching him, *id.* at 9:20, only approximately

11   sixty seconds had passed.  As it stands, the direct threat posed by Mr. Shafer's

12   actions did not provide law enforcement a reasonable amount of time to provide

13   any accommodations. *Compare Vos*, 892 F.3d at 1029-30 (officers were on scene

14   for approximately twenty minutes prior to shooting) *with* ECF No. 32-2 (Officer

15   Martin was on scene for a total of approximately five minutes prior to shooting).

16   Finally, given that Officer Pavlischak did not arrive until the confrontation with

17   Mr. Shafer was underway, it was not unreasonable for Officer Martin to fail to wait

18   for him.  Accordingly, the Court dismisses Plaintiffs' ADA claim on the basis that

19   Mr. Shafer posed a direct threat to the public and the responding officers.

20   //

**C.    Rehabilitation Act Claim**

Plaintiffs and Defendant agree that any analysis governing a claim under the Rehabilitation Act is virtually identical to one under the ADA, except that a party bringing a claim under the Rehabilitation Act must also prove that the relevant entity receives federal funding.  *See* ECF Nos. 30 at 19; 35 at 18; *see also Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th 729, 738 (9th Cir. 2021) (explaining that the elements of a *prima facie* Rehabilitation Act and Title II ADA claim are the same except for the federal financial assistance requirement).  The Court thus dismisses the Rehabilitation Act claim for the reasons discussed above.

**D.    Negligence Claim**

Due to the dismissal of Plaintiffs' ADA and Rehabilitation Act claims, the Court no longer has federal question jurisdiction over this action.  28 U.S.C. § 1331.  Rather than retaining supplemental jurisdiction, the Court dismisses the remaining negligence claim without prejudice.  *See* 28 U.S.C. §§ 1367(c)(3), (d) ("The period of limitations for any claim asserted under subsection (a)  . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.").

**ACCORDINGLY, IT IS HEREBY ORDERED:**

1.    Defendant's motion for summary judgment is **GRANTED**.  Plaintiffs' ADA and Rehabilitation Act claims are **DISMISSED**.

    2.  Plaintiffs' state law negligence claim is dismissed **WITHOUT**

      **PREJUDICE**.

    The District Court Executive is directed to enter this Order, enter judgment, furnish copies to counsel, and **CLOSE** the file.

    DATED November 8, 2023.



THOMAS O. RICE
United States District Judge